UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) |
| v. | ) ) Criminal No.: 19-10117-IT |
| (4)  GORDON CAPLAN, | ) ) ) |
| Defendant | ) ) |

# GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

## Introduction

The government respectfully submits this supplemental memorandum in connection with the sentencing of defendant Gordon Caplan.

Caplan, the chairman of a global law firm, paid $75,000 to have a corrupt proctor correct his daughter's answers on the ACT exam and thereby inflate her score. He had complete insight into every detail of the scheme: how it would work, who was involved, how they would each do their part to pull it off. He paid Rick Singer for no other purpose than committing this fraud. His crime spanned more than eight months and involved two cross country trips with his daughter. Before it was all over, Caplan even hired a law firm to force the ACT to release his daughter's fraudulently inflated test score.

From the start, Caplan made one thing clear: he was "not worried about the moral issue." Committing a crime didn't bother him. The possibility of getting caught did. This fixation on saving his own skin was paramount in virtually every conversation Caplan had with Singer. Caplan brought it up again and again. Not once did he express even the slightest concern about the fact that what he was doing was wrong.

That a lawyer who has reached the apex of his profession could engage in such blatant criminality reveals a staggering disdain for the law.  As much as any defendant in this case, Caplan deserves to go to jail.  The government respectfully recommends that he be sentenced to a term of eight months in prison, a fine of $40,000, and 12 months of supervised release.

**I.** .**Caplan's Relationship with Singer Was Built on Their Joint Pursuit of Fraud.**

Caplan paid Singer for the specific purpose of cheating on the ACT exam.  Unlike other parents who initially retained Singer to provide legitimate college counseling services, but later agreed to engage in illegal activity, Caplan's relationship with Singer was built, from inception, on their joint pursuit of a criminal scheme.  Caplan understood how the scheme worked from his first conversation with Singer.  He embraced its illegal goals without reservation.  And he made his feelings explicit to Singer:  he had no moral qualms about committing fraud.

Caplan spoke to Singer for the first time on June 15, 2018, after they were introduced by a tennis recruiter in Florida.  In that call, which was intercepted pursuant to a Court-authorized wiretap, Singer told Caplan exactly how the scheme worked:  Caplan would pay $75,000 "to get any test scores you would like to get on the SAT or ACT."  He would fly his daughter to Los Angeles on a "fake recruiting visit," so that, while there, she could take the exam at a school Singer controlled.  Singer's proctor would "answer her questions" and "make sure she would-- gets a score that would be equivalent to the number that we need to get."  And, most important, "[s[he doesn't know.  Nobody knows what happens. It happened, she feels great about herself."

Caplan called back later that same day.  He told Singer:  "This notion of effectively going in, flying out to L.A., sitting with your proctor, and taking the exam is pretty interesting."  He asked, "And it works?"  Singer responded, "Every time."  Both men laughed.

So Singer explained further:  to enable the scheme to work, Caplan's daughter would need to qualify for 100 percent extended time on the exam.  He explained:  "[T]he key is the testing,

and we have to get the testing so that we show a discrepancy. It sounds like she has a discrepancy, but I need the discrepancies to be significant enough so that we don't have to appeal and we can go forward." He added: "I also need to tell [your daughter] when she gets tested, to be as, to be stupid, not to be as smart as she is. *The goal is to be slow, to be not as bright, all that, so we show discrepancies*." In the same call, Singer told Caplan that he had "already got the proctor already set up. He lives in Florida. He actually played tennis at Harvard and he'll be the proctor."

Having heard the details, now for a second time, Caplan had just one more question: "So, how do I get this done with you? What do I need to do?"

In a call with Caplan and his wife several weeks later, on July 5, 2018, Singer proposed an additional fraud: hiring one of his associates to secretly take classes on behalf of Caplan's daughter, to improve her grades in preparation for applying to college. Singer explained, "We would do them online and one of my people would take the class for her." Caplan's wife replied that she had a "problem with that." Caplan then picked up the phone and spoke with Singer privately. He asked, "[I]f somebody catches this, what happens?" Singer responded: "The only one who can catch it is if you guys tell somebody." Caplan replied, "I am not going to tell anybody." Once again, the two men laughed.

Later in the call, Caplan returned to the subject of the ACT scam and told Singer he was fully on board. The following is an excerpt from the call.

CAPLAN  Okay, well look, we are in for the, get her extra time, to the extent we can, extra time on the test.

Singer  Right

CAPLAN  And then, and taking the test one time and get her a, you know, a score in the 30s.

Singer  Correct.

CAPLAN  We are in for that, at 75, not an issue.

3

| | |
|---|---|
| Singer | Done. |
| CAPLAN | Done. The other stuff (laughing)-- |
| Singer | That will be up to you guys, it doesn't matter to me. |
| CAPLAN | Yeah, I, I hear ya. It's just, **to be honest, I'm not worried about the moral issue here. I'm worried about the, if she's caught doing that, you know, she's finished.** So I, I just-- |
| Singer | It's never happened before in twenty-some-odd years. The only way anything can happen is if she-- |
| CAPLAN | Someone talks-- |
| Singer | Yeah, if she tells somebody. And that's why even on the payment to the school thing, nobody-- we never tell the-- you know, she just needs to know that you're gonna get some help on this class. |
| CAPLAN | Correct. |
| Singer | She'll be more than happy. |
| CAPLAN | Oh yeah, I, she, *she won't talk.* |

In late July 2018, Caplan and his daughter flew to Los Angeles to meet with Singer's psychologist to obtain the medical documentation required to receive extended time on the ACT exam. Caplan received and submitted the documentation to the ACT. After twice denying the request for extended time, the ACT – acting at the request of law enforcement – granted it in early November. In a call shortly thereafter, Caplan asked Singer – who by this point was cooperating with investigators – whether anyone involved in the scheme had ever been caught. Caplan said: "*[K]eep in mind I am a lawyer. So I'm sort of rules oriented.* Doing this with you, no way -- she's taking the test. It's her taking the test, right? *There's no way-- any trouble comes out of this, nothing like that?*"

In response, Singer once again explained the scheme in exacting detail—and made clear, repeatedly, that there was still time to back out. The choice to engage in fraud, he told Caplan, was Caplan's alone. The following is an excerpt from the conversation, which was consensually recorded.

| | |
|---|---|
| Singer | So then what'll happen is, instead of wherever she was going to take the test, it'll-- now a test will show up-- usually the Wednesday before the 8th, at [the West Hollywood Test Center]. Then what'll happen is, [Mark Riddell], who is the proctor, will fly in, and he will show up on Friday night, just like you guys would show up on Friday night, and then on Saturday morning at 7:45, 8 o'clock, you guys will show up at the school, which is on [LOCATION REDACTED]. And then what'll happen is, you'll go in, Mark will be your proctor. And so this is-- this is, again, how it all works. She'll take the test. It'll be all her taking the test and then at the end of the test, it would be decided that we want to score, let's say, 33, so that she never has to take the test again. It'll be one and done. Then she'll-- you guys will leave and then Mark will then look at all of her answers. Because her answers will be put on a separate sheet of paper and then Mark will go through the answers and will figure out on all four of the-- there's five sections. The fifth is writing. On all four sections and he will decipher her answers and-- and he will go back and-- and ensure that he makes it so that her score ends up being between a 32 and 34, just depending on the curve for that particular test day. And normally he's right on. And that is essentially how it would happen. |
| CAPLAN | *And has anybody ever gotten into an issue with this?* |
| Singer | Nobody. We've done this for four or five years and had probably 20-plus people do it. So-- but that's the process. |
| CAPLAN | *Never been an issue?* |
| Singer | Never been an issue. *So the decision here is yours. I'm-- I'm not-- I don't want to influence you in any way. It's totally up to you guys, however you guys want to do this.* |
| CAPLAN | And do other-- are you guys the only ones who do this or--? |
| Singer | Based on what I know. I only know myself and the families that we work with. And so, you know, we have lots and lots of families. Not everybody gets extended time. Not everybody gets extended time with multiple days. So there's lots of people who cannot do it and then there's lots of people that do do it. So *it's kind of all in your corner. But now-- you understand the process now.* |
| CAPLAN | *I do.* |

5

| | |
|---|---|
| Singer | So that, it's really simple and easy, and it's-- *it's up to you to decide one way or another. And it doesn't matter to me. Whatever you guys want to do.* |
| CAPLAN | No, I understand that, [Singer]. I-- I appreciate that and I-- I appreciate the candor here, and the directness. Okay. Give me a little bit to think about it and I will be back to you on it tomorrow. You-- you obviously need to firm this up right away, right? |
| Singer | Yeah, because we'll need to get the $25,000 wire and then I need to call [Riddell] and Igor to see-- to make sure they're available. My guess is you guys are available on the 8th because you guys were going to take it on the 8th anyways. |
| CAPLAN | Yeah. We'll just make ourselves available. |

Within days of this call, Caplan wired $25,000 to a bank account in Boston, Massachusetts in the name of Singer's sham charity, the Key Worldwide Foundation ("KWF"). Singer had already told Caplan that the money would be a "deposit" to reserve Riddell's services. Singer described Riddell as his "best test-taker," who could "nail a score-- he's that good."

On November 15, 2018, Caplan called Singer again and inquired once more whether anyone "has ever gotten in trouble with this?" Caplan said his wife was "very nervous about all this," and asked Singer for assurance that changing the location of his daughter's exam to Los Angeles would not "create some sort of suspicion or issue? They say, "Why the hell is somebody living in Greenwich taking it out in California?" Repeatedly, Caplan asked Singer whether there was any risk of getting caught. The following is an excerpt from the conversation.

| | |
|---|---|
| CAPLAN | [Let me] ask you straight up. *You've never had an issue with this? No one has ever gotten in trouble with this?* |
| Singer | I've never— |
| CAPLAN | Um— |
| Singer | --had an issue with anybody. We've done this, you know, probably 20 times plus. We did it this summer, because, you know, they moved the ACT, they offered a July test date in California. You couldn't take it in California so we-- we weren't a test center for the-- the summer, so a young person had to go to Houston to do it. |

6

|||
|---|---|
| | We just did it for the subject test for a-- actually a girl that lives both in New York and Aspen. So nothing-- nothing to this point has happened. |
| CAPLAN | Could you ever see that happening? |
| Singer | I-- I'm not-- I have never seen it happen. The only-- so what happened is they changed the test form so that's why Igor got confused, because the form is different for this new school year. So that's why we called ACT, to say, "Okay, what's the simplest way to do this, because she already had a regular ticket, not an accommodations ticket, and this is exactly what they told us on the phone. |
| CAPLAN | But what I'm-- what I'm asking is, is there any way for this to get back to [my daughter] or to the family? I mean, this comes out-- I-- I don't even want to know what you guys do. |
| Singer | So the-- so here-- again, let me just-- I'll just go retrace again. When [your daughter] takes the test, on the 8th, she's going to take the test like she's regularly taking the test, but she will take it, Mark will be there. Mark can answer any questions that she has.  But Mark will proctor the test. She will have all the time, she'll use her computer. She will think when she's done with the test she has taken the test. No doubt about it. The difference is-- is that what we'll do is, instead of her bubbling into the test, which we do with all kids who have learning differences, is they bub-- they write their answers on a separate sheet to the side of it, so that we can rebubble, so we don't screw up the bubbling, which happens a lot for kids. Because they screw up their bubbling. And then she'll-- she'll leave at the end of the test time. Which I don't know who's going to take her. And then— |
| CAPLAN | I will.  I'll be there. |
| Singer | Okay. And you'll-- you'll meet Mark and Igor [Dvorskiy, the test center administrator], and you'll-- you'll go your own way.  [Your daughter] will go in and take the test. She'll be the only one, taking it in the room with-- with Mark. She will take the test. She will walk out the door. At the end of it she'll say to you, "Dad, it was so hard," or "I'm so tired," or whatever the typical reaction out of the kid. Then Mark will finish the exam. He will then take the exam and look at her-- what she's done, and then ensure that whatever score we decide that we want to get-- he has it down to a-- unbelievable that he can do it. Get that number based on the four sections. She'll do the computer writing of the essay herself. That'll be all her. He can help her if she wants some guidance [inaudible] approach. But other than that, that will be all her writing. And she will sign it and she'll walk out of there and she will never know that this actually occurred. You will get your results back in, you know, anywhere from, 11-- depends on what day it goes back in. But anywhere from 11 to 20 days. And she'll get her results and she'll say, "Oh, my God, Dad, I got a 33!" |

| | |
|---|---|
| CAPLAN | So she's been taking Logic Prep and has been getting-- I think her highest score so far is a 22, and she'll probably get up to a 24 on her next practice test. The fact that this could be different than what she had been showing on the practice test— |
| Singer | What-- so you tell me if you want-- would [you] prefer to have her get a 28? 27? 28? 29? Probably based on what you're just telling me right now, right, that -- maybe that's a better approach, because that's still a very good score with her abilities and disability but— |
| CAPLAN | Well, I-- I'm thinking 30, 31 is all we need to do here. |
| Singer | Okay. Done deal. Done deal. It'll be-- it'll be 30, 31. So what happens is the test is curved. I don't know if you know that. The test is curved against everybody in the country. So it can-- we can be one question off, or two questions off, and it can be a 30, it can be a 31. It may be a 29. It could be a 32. Just depends on the curve of the day. But it'll be-- it'll be right there. |
| CAPLAN | But what I'm asking you is, will that be an issue? So when Logic Prep asks us, well, how did she score, will they say, "Hmm?" |
| Singer | So - well, I don't think it matters what they say, because at the end of the day she had a great day, they get credit for her doing really well and they have nothing to do with ACT and/or the colleges she's going to apply [to]. |
| CAPLAN | And they don't feel incumbent on them to say this is suspicious? |
| Singer | Well, I don't see why they would. It would only be a success story for them. |
| CAPLAN | Okay. Okay. I will send out the e-mail and I will send you what I get back. |

Two days before the exam, on December 6, 2018, Caplan and Singer spoke again. Caplan told Singer that he wanted Riddell to score a 32 on the exam, which would place his daughter in the 97th percentile nationally. Again, he asked Singer whether anyone involved in the cheating scheme had ever gotten caught.

On December 8, 2018, Caplan brought his daughter to Dvorskiy's West Hollywood Test Center for the exam, which Riddell corrected as Caplan had directed. Two weeks later, Caplan wired $50,000 into the KWF bank account in Boston.

In January, Caplan learned that the ACT had delayed scoring his daughter's test. Caplan and his wife repeatedly called Singer, concerned that the scheme would be uncovered.

On January 16, 2019, the ACT sent Caplan's daughter a letter notifying her that it was "withdrawing its approval of the requested [testing] accommodations," and that her exam would not be scored  In a call with Singer five days later, Caplan said, "Well, we're fucked." He asked Singer if ACT "had a suspicion of cheating."

But days later, Caplan recommitted to the fraud by hiring a lawyer to challenge the ACT's refusal to score his daughter's test. In a call on January 24, Caplan told Singer he had "gotten counsel involved." Still, he remained concerned about getting caught. He asked, "I need to know, Rick, is there anything going on? Please just tell me. I'm not looking-- I just don't want the family to have any issue here. Is there anything going on with them and you guys or your proctor or Igor Dvorskiy or [the West Hollywood Test Center] or anything like that?" And he said: "*I never want to do anything that couldn't be on the front page of the Wall Street Journal but-- we-- we did what we did*."

## II.     Caplan Should Be Sentenced to Prison for Engaging in Blatant Fraud While Serving as Chairman of One of the World's Largest Law Firms

Caplan committed this crime while serving as chairman of one of the world's largest law firms. He traded on his position when it suited him, telling Singer that he was chairman of prestigious firm and a "rules oriented" lawyer. In truth, his only guiding rules were: don't get caught, and don't have your fraud appear on the front page of the Wall Street Journal. He made it clear that he had no misgivings about paying bribes and cheating. His only concern, which he expressed over and over again, was self-preservation.

The fact that Caplan's relationship with Singer was blatantly and exclusively criminal from the outset distinguishes Caplan from many of his co-defendants. Caplan did not step gingerly over

9

the line. He jumped at the opportunity the moment it was offered to him – the fake recruiting visit, the test center that Singer controlled, the corrupt proctor who would "make sure" his daughter received whatever score he wanted, and the fact that no one would know what happened. All of it was clear from the outset. It appealed to him, and he laughed with Singer about how the scam worked "every time." In his own words, he was "not worried about the moral issue."

Like many con-men, Caplan committed his crime from behind a façade of feigned integrity. Caplan boasted on his law firm's website and in interviews with news organizations about his *pro bono* work for immigrant children even as he secretly conspired to bribe an ACT administrator and pay a corrupt test-taker to cheat on his own child's college entrance exams. Jail is the only appropriate sentence for a leader of the Bar who displays such callous disregard for honesty and the rule of law.

Had Caplan's criminal conduct ended with the exam itself, it would merit a significant sentence of incarceration. But he persisted with an effort to misuse the legal process to secure the benefits of his fraud. After the ACT notified his daughter that it was withdrawing its approval of extended time and would not score her test, Caplan engaged an attorney to pressure the company to change its position, using the implicit threat of litigation in service of his fraud. His actions necessarily entailed lying not just to the ACT, but also to his own lawyer who, in advocating for her client, became Caplan's unwitting accomplice. Even as he took pains to insulate himself and his family from any consequences, Caplan traded on the good name of a fellow member of the Bar to secure the fruits of the fraud.

Such conduct demands jail time. With every reason and every opportunity to back down, Caplan doubled down. He abandoned the oath he took as a lawyer not only by committing fraud, but by engaging another lawyer to secure the object of the fraud. Never once did the "moral issue"

give him pause. Always, and above all, Caplan's focus was on getting the test score and not getting caught. These are precisely the circumstances in which considerations of just punishment, specific deterrence and general deterrence are paramount — and all support the imposition of a meaningful term of incarceration in this case.

## Conclusion

Caplan should be sentenced to a term of incarceration of 8 months, a fine of $40,000, and 12 months of supervised release.

                                              Respectfully submitted,

                                              ANDREW E. LELLING
                                              United States Attorney

                            By:    */s/ Eric S. Rosen*
                                  ERIC S. ROSEN
                                  JUSTIN D. O'CONNELL
                                  LESLIE A. WRIGHT
                                  KRISTEN A. KEARNEY
                                  Assistant United States Attorneys

Date: September 26, 2019