# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GORDON CAPLAN | 1:19-CR-10117-IT<br><br>Leave to file granted on 9/25/2019 |

## <u>GORDON CAPLAN'S SENTENCING MEMORANDUM</u>

Gordon Caplan's life has been characterized by dedication to others—his family, his clients, his friends, even strangers in need. He is a husband and the father of two teenage children, whom he loves more than anything in this world. Until March 12, 2019, Gordon was also a prominent corporate transactional lawyer and co-chair of one of the country's preeminent law firms. He had contributed countless hours and money to charitable causes through his *pro bono* legal work and many philanthropic endeavors. Gordon embodied the ideals of hard work, loyalty, and compassion for others. He was at the pinnacle of his life and his profession—and all of that vanished in an instant when he was arrested for his criminal conduct in this case.

Now a broken man trying to pick up the pieces of a life that has been forever changed, Gordon appears before this honorable Court for sentencing. The Court is faced with the daunting task of deciding what additional punishment—beyond his ruined reputation, the fundamental breach of his daughter's trust, his forfeited livelihood, and the destruction of his legal career—is sufficient, but not greater than necessary, to achieve the objectives of the sentencing process.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████     In a toxic mix of tense family issues at home, aggressive recruiting, and college "advisory" pitches, Gordon knows now that he allowed himself to fall prey to his own ego and ambitions for his children, confusing a desired result with what was best for his daughter. Gordon recognizes how clearly warped his thinking was.

Upon his arrest, Gordon immediately accepted responsibility for his misconduct and has not sought to minimize it in any way. He knew what he did was wrong and that he needed to step up promptly and start down the long, painful road of redemption. He is acutely aware that he hurt his daughter, badly. He is deeply ashamed that his actions have contributed to the idea that wealth and privilege are more important in the college admissions process than merit.

Gordon's efforts to repair the damage he has caused began immediately. Not only did he execute a plea agreement with the government just three weeks after his world was turned upside down with his shocking arrest, he was the very first defendant in the Varsity Blues investigation to issue a public admission of responsibility, announce his intent to plead guilty, and express remorse to the frenzied media. Gordon took full responsibility for his actions, expressing his regret and apologizing to all the students and parents who play by the rules in the college admissions process. After his guilty plea hearing, Gordon was again the very first, and to date only, Varsity Blues parent to face the battery of cameras outside the U.S. Courthouse and reiterate his remorse and accept full responsibility for his conduct. He screwed up. He committed a crime. He has owned it. He was a highly skilled lawyer who should have known better. Yet, the Gordon Caplan who was on the phone with Rick Singer was a father looking at an easier path forward; his role as a corporate lawyer was peripheral to this conduct. And Gordon has paid dearly, both personally and professionally. The damage that Gordon's conduct has visited upon the people most precious

in his life and students he will never meet will reverberate for years.  In arriving at a just sentence here, Gordon respectfully asks the Court to consider several important factors:

   *First,* Gordon's family situation, personal history, and the specific circumstances surrounding his daughter, who it is not disputed had no knowledge of his actions, are mitigating factors.  Perversely, an act Gordon intended to help his daughter had the exact opposite effect. Gordon's conduct increased exponentially the emotional intensity of this period, just as his daughter is now beginning her senior year of high school.  He should have seen the obvious about how harmful the path he chose would be.  As explained below, incarcerating Gordon would also have very serious adverse effects on his son.  Taking Gordon away from his teenage children and wife at this critical moment in their lives would only worsen the situation at home.  ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

   *Second,* Gordon's life of numerous, selfless acts on behalf of family, friends and people he knew only tangentially is amply demonstrated in the more than five dozen letters submitted on his behalf.  Giving back to his community and helping others in need have been constant themes throughout Gordon's life.  The breadth and depth of the submissions on Gordon's behalf, from so many people he has given his time to help over the years, are truly remarkable.  Since the time of his arrest, Gordon has redoubled his volunteering efforts with at-risk children.  The purposes of sentencing would be better served by allowing Gordon to remain in the community, dedicating his time to continuing the positive impact he is making on the lives of at-risk children.

   *Third,* Gordon has already suffered enormous consequences.  His familial relationships have been fundamentally altered, and Gordon will spend years trying to demonstrate to his children

and the larger community that this one incident should not define him as a person.   Professionally, Gordon had to resign his position as partner and co-chair at Willkie, Farr & Gallagher LLP ("Willkie Farr"), and he shortly will be unable to practice law—the only career he has ever known—for at least some period of time.   The Attorney Grievance Committee for the Supreme Court of the State of New York, Appellate Division, First Judicial Department, commenced disciplinary proceedings against Gordon on July 22, 2019, and he has consented to an interim suspension pending the full outcome of those proceedings.   It is expected that the interim suspension will soon be ordered by the Court.   Gordon has also had to resign board positions, received vicious hate mail and threats, and he and his family have been publicly humiliated. Gordon's hard-earned, spotless reputation, built over a 30-year career, is ruined.

*Fourth,* the nature and circumstances of Gordon's offense do not warrant incarceration. Gordon was a limited participant in Rick Singer's overarching scheme.   He conspired with Mr. Singer to cheat on his daughter's ACT exam.   Even though Mr. Singer attempted to get him to engage in other illicit conduct, such as the athletics "side door" at issue with many other Varsity Blues parents, Gordon expressly rejected those other offers.   Gordon was not a "repeat player" who participated in multiple aspects of Mr. Singer's schemes or for multiple children.   Gordon did not involve his daughter in the scheme—R.C. had no knowledge of Gordon's conduct whatsoever, as the government confirmed at the plea hearing.   Gordon did not pursue a tax deduction offered by Mr. Singer, even though the government has alleged that many other Varsity Blues parents sought a tax write-off.

*Fifth,* in fashioning a sentence that is sufficient but not greater than necessary, the Court should avoid unwarranted disparities with similarly situated defendants.   John Vandemoer did not receive any prison time.   Felicity Huffman, who basically engaged in the same conduct as

Gordon—paying Rick Singer his requested fee to deliver an inflated standardized test score—received a 14-day prison sentence. Devin Sloane, who paid $250,000 in bribes to have his son admitted to the University of Southern California ("USC") as a fake water polo recruit, received a sentence of 4 months' imprisonment. Stephen Semprevivo, who paid $400,000 in bribes to have his son admitted to Georgetown University as a fake tennis player and then later sued Georgetown even after pleading guilty, also received a sentence of 4 months' imprisonment. Outside of this case specifically, counsel has not identified any similarly situated defendant convicted in a test-cheating case who has received additional prison time at sentencing, regardless of their Guidelines calculation.

*Sixth and finally,* additional § 3553(a) factors support the recommended sentence. Gordon has never been convicted of any offense and presents zero risk of recidivism. In terms of general deterrence, Gordon's high-profile humiliation that has been a by-product of the intense media coverage and his position as the Willkie Farr co-chair has dissuaded any parent who might have ever considered a similar scheme. Gordon has made public statements expressing his remorse and accepting responsibility for his misconduct. No parent observing this case will ever think that Gordon "got away with it" after his epic downfall from the top of the legal profession to a convicted felon.

Accordingly, Gordon respectfully submits that a sentence of imprisonment is not warranted under the circumstances present in this case. Nonetheless, Gordon acknowledges and respects the fact that the Court is not writing on a clean slate, having already sentenced Ms. Huffman to 14 days' incarceration for essentially the same conduct at issue here. Taking that additional factor into consideration, Gordon respectfully submits that if the Court determines a period of

incarceration is warranted, notwithstanding the various mitigating factors identified herein, that sentence should not exceed 14 days.

## I.     GORDON'S FAMILY BACKGROUND, PROFESSIONAL CAREER, AND LIFE OF HELPING PEOPLE IN NEED

Born in Montreal, Gordon's family moved to New York when he was 5 years old, where his father became a successful obstetrician.[1]

---

[1] The information in the Background section derives, in large part, from paragraphs 82-96 and 100-13 of the Presentence Report, complemented with information from the numerous letters submitted in support of Gordon.

████████████████████████████████████████████

██████████████████████████████

Gordon graduated Cornell University in 1988. He was entrepreneurial in college and scraped together enough money to start buying and renovating small buildings in Ithaca, which he continued doing into the 1990s throughout upstate New York. Around that time, however, his father almost went into personal bankruptcy because he was overly invested in real estate. Gordon started at Fordham Law School in 1988, and over the ensuing three years Gordon was simultaneously taking classes and helping his father resolve his financial issues.

Gordon thrived in law school, graduating near the top of his class and serving as an editor of the Law Review. He started his legal career at Simpson, Thacher & Bartlett LLP in New York, focusing on corporate transactional work for private equity firms and technology companies. While he was working long hours and thriving professionally, Gordon had more personal challenges. In 1996, his mother was diagnosed with stage-four lung cancer, which required aggressive and painful chemotherapy, radiation, and surgeries. She finally lost her long battle in August 2002, just days before Gordon started at Willkie Farr. The entire Caplan family was devastated. Gordon was especially depressed, as his mother was his closest confidante, and losing her was tremendously difficult.

In 1999, Gordon married Amy Treibick, whom he had known since childhood. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

Professionally, Gordon thrived at Willkie Farr, building one of largest practices in the firm through tireless hard work and zealous client commitment. Gordon became a leader in the corporate legal community, publishing articles, speaking professionally, and generally serving as a mentor and role model for younger attorneys. He also became involved in management of Willkie Farr, eventually being elevated to co-chair of the firm in 2015. Gordon was nationally recognized by leading legal publications, and in 2018 he was named American Lawyer's "Dealmaker of the Year." These professional accomplishments have made Gordon's suspension

from the practice of law, the only profession he has ever known, psychologically and emotionally devastating.

In addition to his family and client work, volunteering and philanthropy have always been central to Gordon. He has done *pro bono* legal work for Publicolor, Leadership Enterprise for a Diverse America, and the Alzheimer's Drug Recovery Foundation. Publicolor is a small New York City non-profit focusing on at-risk public school students, and it is perhaps best known for refurbishing dilapidated public schools. Publicolor also provides intensive tutoring and mentoring programs critical to its mission of making sure the most at-risk students in many of New York City's most challenged public school districts graduate high school, get into college, and succeed in college. Publicolor has a robust college scholarship program that Gordon was the driving force behind creating and funding. Gordon started volunteering his time with Publicolor students and working with the organization in 2009; he served on the Board for nearly ten years, including five years as Board Chair. Gordon has devoted well over a thousand hours of his time to Publicolor, donated more than $250,000 and raised another $500,000 for Publicolor through his network.

Gordon has also maintained a close connection to Fordham Law School, donating both his time and money. He was a member of the Dean's Planning Council ("DPC") for close to ten years until his arrest. As Fordham Law School Dean Matthew Diller explains in his letter, the DPC is a key advisory body that meets regularly to assist with curriculum and program development. *See* Ex. A.28 (Diller letter). Gordon has donated over $500,000 to Fordham Law to, in part, endow a scholarship in his mother's name expressly earmarked each year to support a female student with demonstrated financial need, and to support the law school's new Access to Justice Initiative.[2] Gordon was also the first major contributor to the Fordham Law Dean's Criminal Justice Program,

---

[2] Gordon has also endowed a scholarship at his *alma mater* Cornell University in his mother's name. He has donated approximately $500,000 to Cornell over the years as well.

and in 2016 he was awarded Fordham Law's Lefkowitz Public Service Award for his support of the school's *pro bono* clinic programs.

Gordon's *pro bono* work in connection with Fordham Law has had a truly meaningful impact on the lives of total strangers. Dean Diller explains that in January 2017 he mentioned to Gordon that Fahimeh Kashkooli, an Iranian LLM student at Fordham, had been adversely impacted by the Trump Administration's new "travel ban." *See id.* Ms. Kashkooli's daughter suffers from a rare genetic condition, which causes severe complications affecting her vision, development, and coordination. Before the travel ban, Ms. Kashkooli had secured a visa for her 7-year-old daughter, who lived in Iran, to travel to the United States for urgent eye surgery to save her vision. There are only two hospitals in the world—both in the United States—that could perform this highly specialized surgery. Immediately upon hearing her plight, Gordon, who had no personal connection to and had never even met Ms. Kashkooli, took up her daughter's cause in a very personal way. He mobilized a huge team at Willkie Farr to seek judicial relief to allow Ms. Kashkooli's daughter into this country to have this critical surgery. And it worked. Gordon joined his Willkie Farr colleagues, several Fordham Law students, and Dean Diller at the airport to greet Ms. Kashkooli's daughter. Thanks to the effort Gordon spearheaded, this little girl got the surgery she urgently needed and today she can see. Gordon had never met these people before, but as soon as he heard there was a problem that he thought he could help address, Gordon made it happen.[3] As Ms. Kashkooli explains to the Court, "There is no doubt that Mr. Caplan lifted burdens in the most difficult time of our life and when there was darkness he dare[d] to be the first to shine the light. He and [] others completed the brilliant image of this country for the entire world and us.

---

[3]

That will also remain [my] precious memory of this land."  *See* Ex. A.44 (Kashkooli letter).  As further demonstrated below, this type of selfless action by Gordon has marked his entire adult life.

## II.      GORDON'S INVOLVEMENT WITH RICK SINGER

Gordon met Rick Singer in June 2018 through his daughter's college advisor, whom Gordon trusted very much.  The college advisor was a highly respected former college tennis coach and the former head of college placement at IMG Academy, an internationally known high school tennis/sports academy.  Given R.C.'s national ranking as a junior tennis player, the Caplans, who were new to the college admissions process and specifically the collegiate athletic recruiting process, had been approached by countless college "tutors," "counselors," and "advisors."  Many of those people offered the Caplans expensive "services" including application and essay writing, as well as fabricating student profiles.  The Caplans did not engage any of those counselors.  Based on their trusted advisor's glowing recommendation of Mr. Singer, Gordon began to speak with Mr. Singer.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

It was in this moment of emotional weakness and high family stress that Rick Singer, through the trusted college advisor, entered Gordon's life.[4]  Gordon Caplan was perfect fodder for Mr. Singer's pitch—vulnerable, affluent, desperate, and looking to fix an increasingly emotional family situation.[5]  There is no question that the ultimate responsibility for this conduct rests solely

---

[4] The stressful situation at Gordon's home in the fall of 2018 was intensified by a crisis at Willkie Farr, when Gordon's friend and the head of the firm's Frankfurt, Germany office took his own life at age 50, leaving his wife and two young sons.  Within days, Gordon was on the scene in Germany meeting individually with all 40 or so people in the Frankfurt office to help them deal with the tragic events.

[5] Gordon's comment on the wiretap that he was not concerned with the "moral issue" of the plan Mr. Singer proposed is inexcusable, just like the conduct he engaged in with Mr. Singer.  In many respects, this callous statement underscores Gordon's sense of desperation to help his daughter and the degree to which his moral compass was out

with Gordon, but Rick Singer plied his trade by ensnaring parents whose moral and ethical compasses were weakened or compromised for some reason. That is the critical context for how Gordon Caplan ends up before the Court to be sentenced on a felony conviction—an isolated grave breach of his personal integrity, made in a moment of weakness that stands in sharp contrast to the life portrayed in the dozens of letters submitted to this Court from his family and friends.

At first, Mr. Singer offered Gordon traditional counseling and tutoring services as part of the college admissions process. He initially discussed helping Gordon's daughter with tutoring, drafting applications, and preparing for her standardized tests. Gordon agreed to engage Mr. Singer and his company for these legitimate tutoring services and guidance in the admissions process. He also regrettably succumbed to Mr. Singer's well-honed pitch to cheat on his daughter's ACT exam to guarantee her a high score. Gordon otherwise rejected all of the other fraudulent schemes that Mr. Singer repeatedly proposed, including the athletics "side door," cheating on his daughter's high school classes, and taking a tax deduction for his payment to Singer, which are at issue with many other Varsity Blues parents.

Gordon's daughter sat for the full ACT exam on December 8, 2018. She was completely unaware of the agreement between her father and Mr. Singer. That is undisputed. When she finished the exam after several hours and left the facility, Mark Riddell corrected her test to ensure she received a 32 (out of 36).

## III.   GORDON'S CONDUCT SINCE THE TIME OF HIS ARREST

Gordon's life as he knew it ended on March 12, 2019. He was immediately placed on leave from Willkie Farr, and within hours his role in the sensational, scandalous Varsity Blues case was circling the country and globe.

---

of kilter due to both the stress of his family situation and the outsized role that money and special advantages already play in the college admissions process.

Gordon quickly grasped the magnitude of the havoc he had caused.  He knew instantly that his stupidity, his moment of ethical weakness had not just blown up his life and career.  Gordon had inflicted a devastating—and intensely public—blow to the young, vulnerable person he was actually trying to help, his daughter.  R.C., along with Gordon's wife, his 13-year-old son, and his 82-year-old father are all still suffering from the damage Gordon inflicted upon them.  Given that R.C. still has not yet applied to college, Gordon was at least spared the guilt of knowing he had deprived a deserving student of a college admissions slot, yet he was keenly aware that he was a willful participant in a scheme that clearly had that effect on innocent children and families.  In many respects, whatever sentence this Court imposes, knowing that he hurt his daughter so intensely—and deepened societal cynicism about the fairness of the college process—will be the greatest punishment Gordon suffers.

Gordon made it his mission on the day of his arrest to commit to repairing all the damage he had caused.  Gordon quickly agreed to enter a guilty plea, and he did not duck his personal responsibility.  Before this case was even assigned to a judge, Gordon was the very first parent to issue a public statement apologizing for his actions and expressing remorse.  On April 5, Gordon told the world the following:

> I take full and sole responsibility for my conduct and I am deeply ashamed of my behavior and my actions.  I apologize not only to my family, friends, colleagues and the legal Bar, but also to students everywhere who have been accepted to college through their own hard work.  I want to make clear that my daughter, whom I love more than anything in the world, is a high school junior and has not yet applied to college, much less been accepted by any school.  She had no knowledge whatsoever about my actions, has been devastated to learn what I did and has been hurt the most by it.

> My immediate goal is to focus on making amends for my actions to try to win back the trust and respect of my daughter, my family, and my community.  The remorse and shame that I feel is more than I can convey.

> I intend to enter a guilty plea on the criminal charge brought against me in the Varsity Blues college admissions investigation and dedicate myself to trying to right this wrong.

Other defendants soon followed his lead, even adopting his language.  After tendering his plea to the Court on May 21, Gordon was the first Varsity Blues parent, and the only one to date, to face the media scrum outside the courthouse, unequivocally accept sole responsibility for his misconduct, and apologize to all college applicants and their families at large.

Gordon has used this period since his arrest to be with his family and increase his public service commitments.  He has undertaken the challenging process of rebuilding his relationship with his daughter, who has been devastated by her father's very public lack of confidence in her ability to succeed on the ACT exam.  Gordon has spent even more time with his son and his 82-year-old father, who suffers from his own serious health issues.



Gordon has also redoubled his already substantial commitment to volunteering. As a direct result of his conduct here, Gordon had to resign from the Publicolor Board. As Ruth Lande Shuman, the Founder and President of Publicolor explains, "Since 1996, the goal of Publicolor has been to provide students the necessary academic, social, emotional, and leadership skills to help them make their way out of poverty and into the middle class – and for the past decade, Gordon's leadership has led the way." *See* Ex. A.48 (Lande Shuman letter). Shuman explains that despite resigning from the board, Gordon has increased his activity with the organization over the last six months. *Id.* He has spent hours working directly with children in Publicolor programs and helping paint a Bronx public school that was in disrepair. Gordon has helped Publicolor work through various administrative, structural, fundraising, budgeting, succession, and other operational issues. In an effort to provide more direct assistance to the at-risk children Publicolor serves, Gordon researched, designed, and taught a very well-received class on basic financial literacy and life skills

for at-risk teenagers.  In total, Gordon has spent at least 70 hours volunteering with Publicolor since his arrest.

Beyond Publicolor, Gordon sought out new organizations to help, but due to the high-profile nature of the Varsity Blues case, several non-profit organizations have simply refused to allow Gordon to volunteer.  One organization that, due to his persistence, agreed to work with Gordon is a highly regarded local Connecticut children's agency and shelter that has asked to remain anonymous ("CT Agency"), which only serves children in need and in crisis.  Gordon spent several hours applying, interviewing, and being trained to volunteer at the CT Agency, and since June he has volunteered there at least once a week, including teaching his financial literacy program there.  Gordon has spent at least 40 hours volunteering with the CT Agency this summer.

Gordon has continued to contribute financially to the charities and causes that mean a great deal to him and his family.  Gordon and his wife established a charitable family foundation in March 2001, inspired by his mother's battle with cancer.  Over the past ten years, Gordon and his wife have donated in excess of $2 million to various charitable causes through this foundation, including Publicolor, Alzheimer's Drug Recovery Foundation, Legal Aid Society, Children of Fallen Patriots, UJA-Federation of New York, Cornell University, Fordham Law School, and many others.  Since his arrest, Gordon has continued this pattern of generosity.

## DISCUSSION

### I.  THE SENTENCING GUIDELINES

The Court's Memorandum and Order dated September 13, 2019, Dkt. No. 443, held that U.S.S.G. § 2B1.1, which has a base offense level of 7, is the applicable Guideline to be used here. The Court's Order also found that no loss enhancements applied. *Id.* Subtracting two levels for Gordon's acceptance of responsibility results in a total offense level of 5, yielding a Guidelines range of 0 to 6 months.

### II.  CRAFTING A JUST SENTENCE

The law requires the Court to impose a sentence "sufficient, but not greater than necessary" in light of the defendant's personal history and characteristics, nature and circumstances of the offense, need to avoid unwarranted sentencing disparities, need for specific and general deterrence, the kinds of sentences available, and other factors. 18 U.S.C. § 3553(a).

#### A.  Gordon's Personal History and Characteristics

As demonstrated by the more than five dozen letters submitted on his behalf, Gordon is a devoted father, husband, son, brother, uncle, friend, and member of the community who is consistently described as a man of remarkable character who routinely jumps into crises to help the people in his life who are in need.

##### 1.  Gordon's Devotion to His Family

Gordon has long served as the rock at the center of the Caplan family. A sentence of incarceration would be devastating, particularly because it would take him away from his son, who is very dependent on him, as well as his wife and daughter. The words of Gordon's immediate family members are compelling evidence of what kind of person Gordon Caplan is.

According to his wife of twenty years, "Gordon's dedication, generosity, and kindness are limitless." *See* Ex. A.1 (A. Caplan letter). When their children have tough days, she notes that

Gordon is the one to pick them up and help them forward.  *Id.*  When Amy severely broke her leg in multiple places in 2016 and was confined to bed for months, Gordon put his demanding client work aside to read her books and articles every night.  *Id.*  When friends call in the middle of the night looking for help, Gordon literally and figuratively answers the call.  *Id.*

████████████████████████████████████████████████████
████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████

    Gordon's 82-year-old father, Ronald Caplan, M.D., describes his son as "an inspiration and role model to his loving family members, friends, business associates, and acquaintances. He has always been justly noted for his probity, ethical standards, knowledge and judgment." *See* Ex. A.4 (R. Caplan letter). When Gordon was arrested, he could not help but feel intense remorse and shame for the impact this national scandal would have on his father's health. As Dr. Caplan

explains, "My son's only thoughts when he was arrested were for how it would affect others, especially his family, and particularly me.  He called me to apologize to me: he was worried that it would affect my health."  *Id.*  Dr. Caplan continues, "Gordon in this situation, this almost biblical downfall, could not be more remorseful and self flagellating.  He is more determined than ever to continue and expand his good works, which so ironically are heavily weighted to helping disadvantaged and promising students, and others in need.  His family especially needs him."  *Id.*

The letter from Gordon's sister, Randy Perskin, Esq., reflects many of the same themes. *See* Ex. A.7 (R. Perskin letter).  Ms. Perskin explains that her brother "has always been a conscientious and dedicated person whose regard and support for his family has been paramount," and she describes how it is Gordon who always answers the bell during difficult family times.  *Id.* When Ms. Perskin was going through an extremely difficult divorce, "not only was Gordon able to talk me through my emotional pain but he was able to assist in brokering a settlement that was fair and avoided the necessity for protracted litigation.  He looked out for me and my children in a way that went above and beyond his role as a sibling."  *Id.*  The letters from Ms. Perskin's two sons—Gordon's nephews—reiterate that Gordon was a key source of stability during their formative years when their parents were going through this difficult divorce.  *See* Ex. A.8 (T. Perskin letter); Ex. A.9 (Z. Perskin letter).

## 2. Gordon's Immediate Acceptance of Responsibility and Public Statements of Remorse

This Court has emphasized at prior sentencing hearings the importance of early acceptance of responsibility.  As noted above, Gordon's public acknowledgement of his misconduct was immediate and forceful. He did not hide from his guilt and shame.  He turned the humiliating spotlight on his remorse by publicly apologizing and announcing his intention to plead guilty, which led other defendants to follow with similar statements of contrition.  It is beyond question

that in this widely covered case, Gordon has been very public in his expression of remorse and acceptance of responsibility, doing everything in his power to promote the general deterrence effects of this prosecution.

Gordon is particularly ashamed of being involved in a case that centers on the corrupt aspects that too often accompany wealth and privilege in the college admissions process. Gordon's professional success was built on countless hours of hard work and client dedication, every step of the way with the utmost integrity. In mentoring younger attorneys and in raising his children, he stressed that there are no shortcuts to success. Yet Gordon knows that when he was tested during a difficult family time through the introduction to Rick Singer, he failed his values and deepened the cynicism that flows through our public discourse. For this reason, Gordon's public statements have included apologies to all students and families going through the college admissions process who are playing by the rules.



### 4.    Gordon's Extraordinary Service to Others

Gordon has made truly substantial contributions to his community, his clients, his friends,

and sometimes to people he barely knew, both before and after his arrest.  Jack Nusbaum, who

was Chair of Willkie Farr for 23 years, tells the Court that in addition to his devotion to his clients,

Gordon was a "champion of gender and racial diversity and a leader by example of 'giving back' through his many pro bono activities." *See* Ex. A.56 (Nusbaum letter).  Several letters submitted to the Court are from women whose career Gordon helped nurture.  *See, e.g.*, Ex. A.21 (Briggs letter) (describing Gordon as a strong, caring mentor for women trying to make it in the world of big law firms).  For example, Elodie Dupuy describes how Gordon mentored her through her budding career in the male-dominated world of finance and encouraged her to start her own private equity firm focused on technology.  *See* Ex. A.30 (E. Dupuy letter).  Thanks to Gordon's guidance, Ms. Dupuy is now one of very few women running a technology-focused private equity firm.  *Id.* Ms. Dupuy's account is echoed by her partner Jessica Davis, who observed that in a "sector which is often ruled by pedigree – coming from the right school, with the right GPA, with the right look and way of dress – Gordon was focused on raw ability and talent." *See* Ex. A.25 (J. Davis letter). Gordon's college friend, Pedro Casanova described how in 2017, after Hurricane Maria devastated Puerto Rico,  Gordon, who had no personal connection to the situation, organized a chartered plane to deliver food, water, and medical supplies and transport hurricane victims back to the mainland, including Casanova's family. *See* Ex. A.23 (Casanova letter).  First-generation college graduate Kevin Lopez tells the Court how Gordon was an important mentor to him and "no matter how busy he was, he was willing to speak with me and ask me about how I was coming along."  *See* Ex. A.52 (Lopez letter).

Gordon has also repeatedly helped people in crisis, ranging from legal issues to divorce to mental illness. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

Another striking example of Gordon's selflessness comes from Robin Flicker, who has known Gordon for two decades.  *See* Ex. A.33 (R. Flicker letter).  ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████     In sum, Ms. Flicker offers an observation that is the theme of so many of these letters submitted in support of Gordon Caplan: "he has been the person to whom we could always turn, day or night, in even the darkest hours." *Id.* ██████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████

These types of stories from Gordon's family, colleagues, employees, clients, and friends are endless.  Counsel has been flooded with letters on Gordon's behalf, many from people Gordon has stayed friends with for decades, even dating back to elementary school.  There is a constant theme to these letters—Gordon Caplan has repeatedly given of his time and resources to help people in need, from family members to routine acquaintances.  Anna White, Gordon's former administrative assistant, recounts how Gordon repeatedly supported her and her daughters over the

years.  *See* Ex. A.63 (White letter).  Gordon contributed to her daughter's college savings account, found her a top doctor for back surgery, and paid for Ms. White's family to fly to England to visit her brother.  *Id.*  Gordon's impact on the people at Willkie Farr and his clients is striking.  This is evident from the range of people at Willkie Farr who have written to support Gordon, from Fred Reid in the mailroom, *see* Ex. A.58, to the current Chair of the firm Steven Gartner, *see* Ex. A.35, to other lawyers, billing staff, and clients.

Gordon never expected to one day appear before a federal judge as a criminal defendant seeking mercy and compassion.  He certainly did not lead the life recounted so eloquently in all of these letters anticipating that one day he would need them to put his life in context for the judge who holds his fate in her hands.  One does not pull together a sentencing package of this nature only when the chips are down.  As former Willkie Farr Chair Jack Nusbaum stated, Gordon's "stellar reputation" and life of good deeds was "built brick by brick" over decades.  *See* Ex. A.56 (Nusbaum letter).  All together, these letters portray a man whose vast contributions to society greatly outweigh the tragic lapse of judgment that brings him before this Court for sentencing.  No person should be judged solely by their worst moment.

**B.      Gordon's Involvement in this Case and His Conviction Have Already Caused Drastic Consequences for Him and His Family**



### 2.    Devastating Impact on Gordon's Legal Career

In addition to devoting substantial time to his family and his community, Gordon also built a successful law practice.  Gordon's work ethic and dedication to his clients allowed him to rise to the position of firm co-chair.  In one fell swoop, all of that vanished—his partnership, his reputation, his ability to practice.  Gordon was placed on leave from Willkie Farr upon his arrest, and shortly thereafter resigned from the firm.  As noted earlier, the Attorney Grievance Committee in New York commenced disciplinary proceedings against Gordon on July 22, 2019.  Gordon, through his counsel, consented to an interim suspension of his law license during these proceedings, and Gordon expects that the interim suspension will soon be ordered by the Court.  That interim order will be followed by a further full disciplinary proceeding against him and a likely further order of suspension.  To put the matter bluntly, Gordon's professional life has been destroyed.

In contrast, the professional consequences faced by other Varsity Blues parents will not be nearly as severe.  For example, popular movies starring Ms. Huffman continue to be released.  *See When They See Us* (2019, Netflix); *Otherhood* (2019, Netflix).  Many other defendants, like Mr. Abbott (the chairman and founder of a food and beverage distribution and packaging company),

Ms. Buckingham (an author and the founder/CEO of a marketing firm), Mr. Flaxman (the founder/CEO of a real estate development firm), Mr. Huneeus (a vineyard owner), and Mr. Sloane own their own businesses and likely will be able to continue with those enterprises post-conviction. This is not to diminish the consequences facing other defendants, but only to illustrate that the professional repercussions for Gordon are likely to be disproportionately severe when compared to other defendants in this case.  *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court appropriately considered fact that defendant's conviction "made it 'doubtful that the defendant could pursue' his career as an academic or translator," as "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (sentencing court appropriately considered fact that defendant "lost his teaching certificate and his state pension" as one reason justifying a downward variance).

### 3.     Reputational Damage and Public Vitriol

Gordon has suffered immeasurable public humiliation and reputational damage.   In addition to resigning his law firm partnership, Gordon was compelled to resign from the Board of Publicolor and from the Dean's Planning Counsel at Fordham Law.  Even financial institutions, with which Gordon had sustained relationships over several decades, abruptly severed ties with him.   Since his guilty plea in this case, the financial institutions with whom Gordon and his family have done business for years—JP Morgan and Citibank—have unilaterally terminated him as a client. Just days before the filing of this Memorandum, Gordon was abruptly notified by his insurer that in October all of his insurance coverage—personal, homeowners, auto, umbrella, and other— will be canceled.

Gordon has also been the target of vitriolic attacks because of the widespread outrage caused by the Varsity Blues scandal as a whole.  After his arrest, he received emails, threats, and

hate mail at home from complete strangers denigrating his character and expressing a desire to see him punished, several of which were unapologetically anti-Semitic and referred to Gordon as a "dirty Jew" and "Jew lawyer."  He has been the subject of constant attacks on social media platforms and in the news media.  Gordon will live with this stigma for the rest of his life.

### C.    Avoiding Unwarranted Disparities with Sentences for Similarly Situated Defendants

#### 1.    Other Varsity Blues Parents

Felicity Huffman, like Gordon, participated in Rick Singer's exam cheating scheme.  They engaged in the exact same conduct and received the exact same benefit: payment in exchange for an inflated test score.  They also both accepted responsibility immediately, though Gordon was even more conspicuous in issuing a public statement and speaking on camera.  The fact that Rick Singer, an admitted con-man, unilaterally decided to charge Gordon more than some other parents for the test cheating scheme does not itself make Gordon more culpable than those other parents. The Court sentenced Ms. Huffman to 14 days in prison, followed by 1 year of supervised release with 250 hours of community service, and a $30,000 fine.  Unlike Ms. Huffman, Gordon never considered the exam cheating scheme for a second child, and unlike Ms. Huffman, Gordon has been stripped of his professional license.[6]

Devin Sloane paid $250,000 to bribe a USC employee to have his son admitted as a fake water polo recruit.  Not only did Mr. Sloane's son not play water polo, Mr. Sloane enlisted his son to create doctored water polo action shots in the backyard pool.  The Court sentenced Mr. Sloane

---

[6] Gordon did hire a lawyer to advise him about how to address the ACT's decision to withhold R.C.'s score, a possibility Huffman never had to confront.   Gordon did this because the ACT was raising questions about whether extra time had been properly provided to R.C. but no one from the ACT was responding to Gordon's repeated inquiries.  For the reasons discussed above, there is no question that R.C. qualified for extra time long before Gordon ever met Rick Singer.  Gordon hired this lawyer to present this medical information to the ACT; Gordon and his attorney never threatened to sue the ACT or take any action other than present the legitimate medical information.  To the extent the Court considers this aspect of Gordon's conduct an aggravating factor compared to Ms. Huffman, this alone does not warrant more prison time.

to 4 months' incarceration, followed by 2 years of supervised release with 500 hours of community service, and a $95,000 fine.  Gordon's conduct stands in stark contrast to that of Mr. Sloane.  Even putting aside the huge payment, most notably Mr. Sloane agreed to bribe a college employee and ensnared his son in his fraudulent scheme.  And whereas Mr. Sloane seemingly continues to claim that he did not have full knowledge of how the payments he made to Mr. Singer would be used, Gordon has accepted complete and sole responsibility for his actions from day one.

Stephen Semprevivo paid $400,000 to Mr. Singer to facilitate his son's admission to Georgetown University as a purported tennis recruit.  He corrupted his son's integrity by having him send fraudulent emails to the Georgetown tennis coach.  Moreover, even after pleading guilty in this case, Mr. Semprevivo sued Georgetown to prevent the school from expelling his son, and even argued in his Sentencing Memorandum that he was a "victim" of Rick Singer's schemes.  The Court sentenced Mr. Semprevivo to 4 months' imprisonment, followed by 2 years of supervised release with 500 hours of community service, and a $100,000 fine.  In sharp contrast to Mr. Semprevivo, Gordon has owned up to the fact that he committed a crime, accepted full responsibility, and demonstrated clear remorse for his actions.

> **2.    Similarly Situated Defendants in Other Test-Cheating Cases Have Almost Never Received Prison Time, and Only Rarely Have Even Received Sentences of Time Served**

Similarly situated defendants who have been convicted in other federal test-cheating cases have not been sentenced to additional prison time even at higher Guidelines levels.  In this district, several individuals were charged with cheating on the Test of English as a Foreign Language ("TOEFL") exam in 2017.  The defendants either hired others to take the TOEFL exam for them or took the test for others using a different name.  Four of the five defendants had a Guidelines range of 6 to 12 months.  *United States v. Huang*, No. 17-cr-10255 (D. Mass. Apr. 2, 2018); *United States v. Zhang*, No. 17-cr-10251 (D. Mass. Oct. 5, 2017); *United States v. Wang*, No. 17-cr-10237

(D. Mass. Sept. 19, 2017); *United States v. Chang*, No. 17-cr-10225 (D. Mass. Aug. 30, 2017).

The defendant who appeared before this Court had a Guidelines range of 0 to 6 months. *United

States v. Wang*, No. 17-cr-10402 (D. Mass. Apr. 25, 2018). All five defendants received a sentence

of time served and had no additional prison time imposed. Notably, during the *Wang* sentencing

hearing the government was asked whether Ms. Wang's conduct was more egregious than a

defendant cheating on an SAT exam. *Wang* sentencing transcript at 10-11. The government

unequivocally stated that this conduct was "***absolutely worse***" than a defendant cheating on the

SAT exam. *Id.* at 11 (emphasis added). Even so, the Court sentenced Ms. Wang to one year of

probation.

Similarly, defendants who were convicted in analogous federal test-cheating cases in other

districts have received non-custodial sentences. In 2003, for example, multiple defendants were

convicted in a TOEFL cheating scheme—including some defendants who were convicted

following a trial—and most received only probationary sentences, with some receiving time-

served. *See United States v. Alsugair*, No. 02-cr-779 (D.N.J. Oct. 30, 2003); *United States v.

Alkaabi*, No. 02-cr-778 (D.N.J. Apr. 15, 2003); *United States v. Al-Aiban*, No. 02-cr-371 (D.N.J.

Mar. 13, 2003); *United States v. Hedaithy*, No. 02-cr-379 (D.N.J. Feb. 4, 2003).[7]

More generally beyond federally prosecuted cases, ACT, Inc. and the College

Board/Educational Testing Service acknowledge there are thousands of suspected cheating cases

on the ACT and SAT every single year. *See, e.g.*, Jenny Anderson & Peter Applebome, *Exam

Cheating On Long Island Hardly a Secret*, N.Y. Times, Dec. 2, 2011,

https://www.nytimes.com/2011/12/02/education/on-long-island-sat-cheating-was-hardly-a-secret

---

[7] In the few federal test-cheating cases that the government cites, the defendants who received custodial sentences
were more analogous to Mr. Singer and Mr. Riddell—*i.e.*, those who organized and participated in virtually every
facet of the scheme—not the parents in this case.

.html ("According to the Educational Testing Service, which administers the exam for the College Board, about 3,000 scores are canceled each year because of suspected cheating, 150 involving impersonation.").  Typically, the testing agency will simply cancel the score.  In those rare instances involving a broader, coordinated cheating scheme that was uncovered and prosecuted by law enforcement, counsel has not identified any instances of a parent or student who paid to have someone else take the test being convicted and sentenced to a term of imprisonment.[8]

### D.      Additional § 3553(a) Factors

In terms of specific deterrence, whatever sentence the Court imposes, Gordon will carry this conviction with him for the rest of his life.  The intense media scrutiny ensures that he will never live this sad episode down.  Gordon is a first-time offender with zero risk of recidivism.  He has demonstrated a clear commitment to making amends.

As for general deterrence, there can be no doubt that the unusually high-profile nature of the Varsity Blues case will deter any other parent who might even consider cheating in the college admissions process.  In particular, Gordon's felony conviction, public humiliation, and loss of his position as co-chair of a prestigious international law firm only further drive home the point that all people will be held accountable for their actions if they break the law.

### CONCLUSION

For all the reasons detailed above, sentencing Gordon to a term of incarceration would be greater than necessary to achieve the goals of sentencing.  While Gordon respectfully submits that a sentence of probation is appropriate here, he is also keenly aware of the prior sentences that have been handed down by the Court in the related cases and the thoughtful rationale articulated by the

---

[8] For example, in the 2011 SAT cheating scandal on Long Island discussed in the *New York Times* article cited above, Anderson & Applebome, *supra*, the Rick Singer-type figure who was the ringleader of the scheme reached a plea agreement with the district attorney's office to conduct community service and did not serve any time in prison.  Nor did prosecutors seek prison time for any of the test-takers or the students who paid for the fraudulent tests.

Court for imposing some term of imprisonment.  To the extent the Court believes that this principle needs to apply across all defendants, Gordon respectfully submits that a sentence of no more than 14 days' imprisonment is fair and just for all the reasons stated above.  Such a sentence, accompanied by supervised release, community service, and a fine is sufficient but not greater than necessary to achieve the multi-faceted goals of sentencing.  No matter what sentence the Court imposes, Gordon will continue engaging in his work with at-risk children as he has been doing for most of his adult life.

Dated:  September 26, 2019                  Respectfully submitted,

By:  /s/ Joshua S. Levy
      Joshua S. Levy (BBO #563017)
      Christopher J. Walsh (BBO #685252)
      Ropes & Gray LLP
      800 Boylston Street
      Boston, MA 02199-3600
      Tel: (617) 951-7000
      joshua.levy@ropesgray.com
      christopher.walsh@ropesgray.com

      Michael G. McGovern (admitted *pro hac vice*)
      Ropes & Gray LLP
      1211 Avenue of the Americas
      New York, NY 10036
      Tel: (212) 841-8860
      michael.mcgovern@ropesgray.com

      Patrick J. Smith (admitted *pro hac vice*)
      Sarah Zimmer (admitted *pro hac vice*)
      Smith Villazor LLP
      250 West 55th Street, 30th Floor
      New York, NY 10019
      Tel: (212) 582-4400
      patrick.smith@smithvillazor.com
      sarah.zimmer@smithvillazor.com

      *Attorneys for Defendant Gordon Caplan*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document(s) filed under seal on paper will be served on counsel of record via electronic mail on September 26, 2019, and that redacted versions will be filed through the ECF system to the registered participants as identified on the Notice of Electronic Filing (NEF) on September 26, 2019.

By: _/s/ Joshua S. Levy_____